UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X     Dkt. No.
WILLIAM O'BRIEN,

        Plaintiff,

    -against-                                                    **COMPLAINT AND
                                                                          JURY DEMAND**

UNITED PARCEL SERVICE OF AMERICA, INC.,
a/k/a UPS,

        Defendant.
-----------------------------------------------------------------------X

      Plaintiff, WILLIAM O'BRIEN, by his attorneys, Gabor & Gabor, as and for his

Complaint and Jury Demand, respectfully alleges as follows:

      1.      At all times relevant hereto, Plaintiff, WILLIAM O'BRIEN, was a resident of the

State of New York, County of Suffolk.  The plaintiff currently resides in Pennsylvania.

      2.      At all times relevant hereto, Defendant, UNITED PARCEL SERVICE OF

AMERICA, INC., a/k/a UPS, (referred to herein as "UPS"), is a domestic company with offices

throughout the United States.  UPS' main office is located at UPS Corporate Headquarters, 55

Glenlake Parkway, NE,  Atlanta , Georgia 30328.

      3.      At all relevant times hereto, the plaintiff reported to an office in New York City

located at 4215 Boston Post Road, Bronx, New York 10466.


### JURISDICTION AND VENUE

      4.      This is a civil rights action brought in order to redress multiple deprivations by the

Defendant of Plaintiff's rights secured by the Americans With Disabilities Act and the Age

Discrimination in Employment Act.  Jurisdiction is conferred on the Court by 28 U.S.C. 1331

and 28 U.S.C. 1343.  This Court has pendent and supplemental jurisdiction pursuant to 28

U.S.C. 1367 based upon plaintiff's State and City Law claims.

     5.      Venue is based on 28 U.S.C. §1391.


## STANDING

     6.      The defendant employs more than 25 persons at all times.

     7.      On or about December 19, 2006, the plaintiff filed a charge of discrimination with

the U.S. Equal Employment Opportunity Commission, (hereinafter, "EEOC"), alleging certain

violations of the ADA, ADEA, and retaliation.

     8.      The plaintiff received a "Right to Sue" letter from the EEOC dated September 12,

2007.  This action has therefore been commenced in a timely manner.

     9.      A copy of this federal court complaint has been served upon The New York City

Commission on Human Rights and upon Corporation Counsel.


## FACTS

     10.     The plaintiff was born on December 24, 1955 and is presently fifty-one (51) years

of age.  He suffers from emphysema. The plaintiff has also suffered on the job injuries to his

neck, back and shoulder.

     11.     The plaintiff was hired to work for UPS in June 1987.

     12.     The plaintiff began work for UPS as a driver in the Metro New York Garment

District.

13.     The plaintiff's last position with the company was as an Operations Supervisor.

14.     The plaintiff has always been a tireless, dedicated and loyal employee.

15.     As an Operations Supervisor, the plaintiff's responsibilities consisted of training new drivers, retaining existing drivers, covering as needed, dispatching, working with safety and various other tasks as needed.

16.     In January 2003, Chester Slaybaugh was assigned to the Manhattan East Center as the Manager.

17.     Slaybaugh was aware of the plaintiff's age and that he suffers from emphysema.

18.     Slaybaugh replaced Anthony Coker, who the plaintiff had worked for during the two (2) years prior and had given the plaintiff good reviews.

19.     In February 2003, the plaintiff met with Slaybaugh regarding a request for a transfer.  The plaintiff explained that he was forty-seven (47) years old and that he was not sure how much longer he would be able to work as an On-Car Supervisor and requested a transfer to tractor trailers.  The plaintiff has maintained a Class A License since 1977.  The plaintiff also explained that he was diagnosed with emphysema and that it would only get worse over time. Slaybaugh told the plaintiff that he would try but that the plaintiff should not count on anything.

20.     From that point forward, Slaybaugh began to micro-manage the plaintiff and to second guess everything that the plaintiff did.

21.     By way of an illustration, in February 2003, Slaybaugh followed the plaintiff while the plaintiff was conducting on-the-job supervision.  Slaybaugh spent fifteen (15) minutes with the team and then left.  The following day, the plaintiff was called to Slaybaugh's office

3

where he handed the plaintiff a memo that he had written to Pat Sheppard, who was then the

Division Manager concerning his observations of the plaintiff's on-the-job supervision.  The

memo was extremely critical of the plaintiff and the methods that he used.  It would not have

been possible to draw all of the conclusions that he reached in the fifteen (15) minutes that he

spent observing the plaintiff's style of supervision of his subordinates.

22.    Slaybaugh unfairly criticized the plaintiff with regard to his style of supervision of

a problem driver in or about March 2003. That particular driver had chronic attendance and

production issues.  The plaintiff did the best that he could with the driver.  Slaybaugh went out

with the driver for three (3) days, eliminated some difficult stops and still failed to achieve better

results.  Nevertheless, the plaintiff was criticized for the handling of that driver.

23.    In May of 2003, Slaybaugh told the plaintiff that he was totally dissatisfied with

the plaintiff's performance and that drivers were complaining about him.  Slaybaugh then told

the plaintiff that when Pat Sheppard got back from his special assignment, they would be

discussing the plaintiff's future with UPS.

24.    In June 2003, the plaintiff had a meeting with Slaybaugh and Sheppard.  During

the meeting, Slaybaugh tried to conjure up false accusations against the plaintiff and disparaged

the plaintiff's job performance.  However, no specifics were even mentioned.  Sheppard

explained that he relied on input from the plaintiff's Manager, Slaybaugh.

25.    In July 2003, the plaintiff was called into Slaybaugh's office on the Friday before

a scheduled vacation whereupon Slaybaugh told the plaintiff that when the plaintiff got back

from vacation he was being reassigned to the Brush Avenue facility in the Bronx.  Slaybaugh did

not know which center the plaintiff was assigned to and that the plaintiff should call him during

vacation to find out.  The plaintiff had to call Slaybaugh three (3) times during vacation before he would tell the plaintiff that he should report back to the Manhattan North building on Monday to run the night sort for vacation coverage.

26.    That Friday, the plaintiff was told to report to Brush Avenue the following Monday, where the plaintiff would be meeting with Ed Harding, the Center Manager of the Pelham Bay Center.  Slaybaugh then said that the plaintiff was, "at best, a mediocre supervisor, middle of the pack, nothing more."

27.    The plaintiff reported at 7:00 am on Monday, as instructed, and met with Harding. After dispatch, the plaintiff met with Harding and Sheppard during which time the plaintiff was told that he was reassigned as part of a "swap."  The person who was "swapped" with the plaintiff was, upon information and belief, forced to resign six (6) months afterwards.  He had been with UPS for twenty-six (26) years.

28.    The plaintiff's new team consisted of the Manager and three (3) Supervisors.   The Manager was approximately 40 years of age. One of the Supervisors, Rich Leblanc, approximately 45 years of age, was an individual with whom the plaintiff had never worked before.  The other Supervisor, Manny Pujol, approximately 38 years of age, was an individual with whom the plaintiff had previously worked.  Pujol was transferred shortly thereafter.  Pujol was replaced by Garland Dalton, approximately 25 years of age.

29.    Due to the change in structure, there was no one to fill in for Harding when he was out of the office.  The plaintiff volunteered to cover for Harding when he was out.  Harding and Sheppard told the plaintiff that they liked the way that he ran the center when Harding was away.

5

30.     In September 2003, Harding and Sheppard had a discussion regarding the need to conduct an "OJS" of Alexandro Anduhar, a poor performer who was averaging only twelve (12) stops per hour. "OJS" stands for on the job supervision.  It is necessary to supervise the driver for three (3) days during which time the driver is supposed to work with the supervisor nonstop.  He had been "OJS" previously to 14.6 stops per hour.  The plaintiff volunteered to conduct the OJS. For the next three (3) days that driver averaged 15.9 stops per hour.

31.     In early 2004, production was below expectation at the center where the plaintiff was stationed.  Heavy snowfall made it even more difficult to improve on production.  Harding, Sheppard and the plaintiff agreed that the plaintiff should continue to perform OJS's.  In each instance the driver's production improved.

32.     As a result of the plaintiff's efforts, drivers were held accountable for increased production.

33.     The plaintiff was the only supervisor holding people accountable at the center which resulted in issues concerning demands.  At the same time, increasing productivity resulted in substantial savings to UPS in payroll.

34.     In or around January 2005, Sheppard was transferred from the division to the Regional office where he was responsible to train all Supervisors and Managers in the district on how to perform OJS's.  Sheppard held a week long seminar regarding the OJS.

35.     Upon information and belief, the plaintiff was either the only one, or one of very few, Managers and Supervisors who was not requested to attend the training session based upon experience and past results.

36.     In or about early 2005, Slaybaugh was promoted to Division Manager.

37.     In or around June and July 2005, the plaintiff was requested to conduct an OJS for a driver who had signed for a route and was well below standards for production.  At the end of the OJS the driver's production improved from between 11.5 and 12.0 stops per hour, to 14.7 stops an hour.

38.     Slaybaugh was the only management official who was critical of the plaintiff's work with this driver.

39.     In or about Spring 2005,  Dennis O'Sullivan was moved into the plaintiff's division. Several tactical decisions made by Slaybaugh, over the objection of Harding, resulted in a dramatic increase in the compensation rate.  This caused the Center to fall short on goals set by Slaybaugh.

40.     Upon information and belief, Slaybaugh made these tactical decisions to doom Harding and the plaintiff to failure.

41.     As a result, Ed Harding resigned after more than 20 years of service with UPS.

42.     Upon information and belief, Harding was forced out by Slaybaugh due to age.

43.     Harding was replaced by Tom Gilmartin who had been a Manager in the Yorktown building.

44.     During November and December 2005, there were two (2) drivers under the plaintiff's supervision who had problems with their work performance.  The drivers were averaging between  7 to 10 stops per hour.  Whenever the plaintiff spent time with either one of them, their production doubled.  One of the drivers was fired for theft of services the week before Christmas.  Gilmartin requested that the plaintiff train the other driver in or around January 2006.  The plaintiff retrained both drivers.

7

45.    When a driver had too much work, the plaintiff would "run cover," which is support that is given to a driver with an extremely large load.

46.    The plaintiff worked with Mueller, a driver, with less than six (6) months experience and had received many customer complaints, had constant production issues and had gotten into several arguments with other drivers.  Mueller was approximately 24 years of age.

47.    In February 2006, the plaintiff was out with Mark Martinez running cover when the plaintiff received a call from Gilmartin that Mueller sent a message that he would not be finished with his route until midnight.  The plaintiff and Martinez worked hard to complete the route.  A couple of hours later, they were told that Mueller had sent another message saying that his estimated completion time was 10:00 pm.  The plaintiff and Martinez pulled up to Mueller's truck at about 6:00 pm.  Mueller had turned his vehicle off, but had left his 4-way flashers and headlights on and his battery was almost dead.  His vehicle was a mess.  The plaintiff and Martinez took another 20 stops from Mueller and reset his load in the proper order.  When Mueller finally returned to the building at 9:00 pm, the plaintiff discovered that there were 56 packages brought back by him.  Of the 56 packages, 28 were never attempted but were falsely recorded as "no such address."  Copies of the falsified papers were placed in his file. The next morning Slaybaugh met with the business agent, the steward and Mueller.  Slaybaugh then allowed Mueller to disparage the plaintiff without any repercussions.  After about 10 minutes Slaybaugh turned to the plaintiff and said, "What do you have to say for yourself?"  The plaintiff took out Mueller's file and began to review the 28  falsified package records one at a time.  Everyone sat and squirmed. The steward spoke with Martinez who corroborated the plaintiff's story.

48.     It was clear that Slaybaugh was looking for a reason to fire the plaintiff.

49.     In September 2005, the plaintiff handled deliveries for the Fordham center due to staffing shortages.  This was the first time that the plaintiff had handled that particular route.  The first stop was a school where there were approximately 45 packages to deliver including 20 and 50 lb packages of text books.  The boxes were stacked to the top of the door.  The plaintiff took the first package and placed it on the hand truck. At that moment the entire wall of packages fell on the plaintiff and injured his neck and left shoulder.

50.     The plaintiff notified Dennis O'Sullivan, the Manager from the center, that he was covering that day and about the injury.  O'Sullivan notified Slaybaugh who proceeded to call the plaintiff on his cell phone.  The plaintiff told Slaybaugh that he needed medical attention.  After a long pause on the other end of the phone, Slaybaugh said that the plaintiff should continue working and that he would send another supervisor.

51.     The plaintiff was never relieved of his duties that day in order to see a doctor. The plaintiff returned to the building at approximately 10:00 pm that night. O'Sullivan had come out to the plaintiff on the road to check on his progress, but never asked how the plaintiff felt. Later that day, the plaintiff was criticized for not completing the route faster.

52.     Gilmartin filled out an injury prevention report about the incident.   Apparently, the injury was not called in which was inconsistent with UPS practice.  As a result, the plaintiff continued to work which aggravated the injury.

53.     The plaintiff was concerned about retribution and chose to treat with physicians through his medical plan.  The injury caused the plaintiff to suffer three (3) herniated discs and three (3) bulging discs.  The plaintiff was also told that it seemed like he had tendinitis.

54.    In July 2006, the plaintiff was called into Slaybaugh's office along with Gilmartin regarding the plaintiff's career development review.  The meeting began with Slaybaugh asking the plaintiff how many years he had left with the company.  During the meeting, the plaintiff requested a reassignment to security or district safety instructor.  Slaybaugh refused to consider the plaintiff for either position.

55.    The reason given by Slaybaugh for not putting the plaintiff in the district safety position was false.  The real reason was age and disability discrimination.

56.    The plaintiff told Slaybaugh that he had had a class A license for the previous twenty nine (29) years and would do very well working nights in the trailer department. Slaybaugh said there was no room because of  downsizing.

57.    Toward the end of the meeting, Gilmartin brought up the possibility of promoting the plaintiff to Manager.  Slaybaugh said that he would never consider the plaintiff for a promotion.  However, Slaybaugh did admit that the plaintiff met all of the requirements for a promotion.

58.    Gilmartin was extremely supportive of promoting the plaintiff to manager.

59.    Shortly thereafter, Gilmartin took a vacation.  During Gilmartin's vacation, Slaybaugh called the plaintiff into a meeting with a fellow Supervisor and advised the plaintiff that he was to report to the Mount Vernon building effective immediately.

60.    The plaintiff called Gilmartin later that day.  Gilmartin had no idea about the transfer and was upset that he had not been told in advance or even consulted.

61.    The plaintiff reported to the New Rochelle center where there was only one supervisor.  The manager, Nava Gnessen had recently been promoted to Division Manager.

There was no manager and the other supervisor, Joe Reynolds, was on vacation. Mark Lisowski was the only management person available, so the plaintiff reported to him. Tommy Francis was named the new Manager of the center.

62.    In July, 2006, the plaintiff received a call from Rich LeBlanc who told him that Blackmore had an accident while driving up 214th Street and instead of going right at Barnes Avenue he made an illegal left turn and hit a kid coming down 214th Street from the opposite direction on a skate board. He told the plaintiff that Blackmore indicated in the investigation that he was trained by the plaintiff to go that direction.

63.    The next day, the plaintiff was questioned by Steve Foy who is a Manager in the Safety Department. The plaintiff told Foy that he did not recall the intersection, but assured him that he would never train any employee to make an illegal maneuver. Foy told the plaintiff that Slaybaugh had said to him that Slaybaugh would talk to the plaintiff and request a write up of the training that Blackmore received.

64.    On the following Monday, Slaybaugh called the plaintiff to ask for the write up on the accident. The plaintiff did the write up and sent it to him by e-mail.

65.    The following day, Mike Abatelo, a Manager from the Security Department met with the plaintiff for approximately forty-five (45) minutes regarding the Blackmore accident. Abatelo seemed satisfied with all of the answers that the plaintiff gave and said that his meeting should conclude the plaintiff's involvement with the accident. Abatelo further indicated that he could not see where the plaintiff had done anything wrong.

66.    Immediately after that meeting, Slaybaugh cornered the plaintiff and began to grill him about the accident. Slaybaugh said that he did not believe a word that the plaintiff said. He

said , "I think that you're lying."  At that moment Abatelo  walked into Slaybaugh's office and sat down.  The plaintiff asked Abatelo for delivery records of the days that the plaintiff had trained Blackmore.

67.     The plaintiff and Abatelo had reviewed all of the records for the five (5) days that the plaintiff was with Blackmore. There was no evidence that Blackmore and the plaintiff had ever had the need to cross over Barnes Avenue. This clearly showed that the plaintiff would have had no reason to tell Blackmore to make an illegal turn.  This was proof that the plaintiff had done nothing wrong.

68.     Abatelo went up to Slaybaugh's office after that. He returned downstairs about fifteen (15) minutes later and told the plaintiff that Slaybaugh still demanded an additional write up from the plaintiff and that he would probably be interviewed again.

69.     The next day, the plaintiff was summoned to Slaybaugh's office at Brush Avenue at noon.  The plaintiff had to wait for thirty (30) minutes for the meeting to begin.  Slaybaugh then proceeded to grill the plaintiff for an hour and 15 minutes by asking the same questions over and over again.  He took out Blackmore's training packet.  Slaybaugh accused the plaintiff of falsifying the packet. There were some entries for driving training that had the same date on them.  The plaintiff told Slaybaugh that there were 2 separate packets and that Brian McQuade, a Supervisor, went out with him one day and lost the original packet.  Slaybaugh did not believe the plaintiff and got in touch with Gilmartin who corroborated what the plaintiff had said. Gilmartin  explained the entire packet was recreated after the fact and reviewed with Blackmore in the office. It was evident that Slaybaugh wanted the plaintiff to change his statement.  It was clear that  Slaybaugh was trying to find cause to fire the plaintiff.

70.     On or about September 1, 2006, Slaybaugh proceeded to harass the plaintiff for no good reason.  The plaintiff was in his vehicle making notes about the work that he needed to do that day.  Slaybaugh, for no legitimate reason, pulled up next to the plaintiff and demanded that the plaintiff reverse direction and go all the way around the block and make a u- turn on Boston Post Road.  This did not make any sense.  The plaintiff then received a call from Jack McCarren, Manager of the Yonkers Center who told the plaintiff that Slaybaugh wanted to see him at the Brush Avenue building immediately and that the plaintiff should tell the other Supervisors that he would not be back that day.

71.     The plaintiff arrived at Brush Avenue about a half hour later.  Slaybaugh told the plaintiff that he could not tolerate a management person doing things that jeopardized safety in his division. He then accused the plaintiff of having a pattern of doing unsafe things in the workplace.  Slaybaugh told the plaintiff to go home because he no longer had a job.  Slaybaugh said that he would be in touch with the plaintiff.

72.     Slaybaugh called the plaintiff on Tuesday, September 5, 2006.  He told the plaintiff to report to the 43th street building on Wednesday September 6, 2006, by 9:00 am for a meeting with Henry Beards, the District Human Resources Manager.  The plaintiff arrived as instructed before 9:00 am and was forced to stand outside Beard's office for over an hour waiting for him.  The plaintiff was humiliated.

73.     The plaintiff finally met with Slaybaugh and Beards shortly after 10:00 am. Slaybaugh and Beards took turns berating the plaintiff for the incident with Blackmore and falsely accused the plaintiff of lying.  Slaybaugh kept saying that he did not have a job for the plaintiff.  At the end of the meeting, the plaintiff was told that he could keep his job but that he

would not be receiving his management incentive award that year.

74.    On several occasions after that, the plaintiff witnessed the trailer drivers, mechanics, and carwashers drive down the street the same way the plaintiff had. Lisowski said that Slaybaugh had seen him drive the same way the day before the plaintiff was fired.

75.    The plaintiff brought this to the attention of both of the managers in the building. The plaintiff made it clear that he felt that Slaybaugh had singled him out due to his age.

76.    The plaintiff was told that the defendant would not do anything to help him.

77.    There happened to be an occasion when it was raining heavily and the air trailer arrived to the building after the drivers were dispatched. The driver traveled to the end of the block and turned around and drove the opposite way up the street and backed it into the building. Both of the managers, the shop steward, and the union co-chair of the safety committee witnessed this event. The plaintiff approached the managers about it and they refused to discuss it with him. The driver said that trailer management told him to do it that way. This is akin to what Slaybaugh fired the plaintiff for.

78.    At the end of October, 2006, Abatelo refused to give the plaintiff a copy of the Blackmore file that he requested.

79.    On or about November 16, 2006, the plaintiff went to check on a trainee who was sent out on his own despite the plaintiff's objections that the trainee was not ready. The plaintiff was told by Tommy Francis, the Manager, to let the trainee go and to catch up with him at lunchtime. The plaintiff caught up with the trainee at 12:30 pm and discovered that he had only done 15 stops. The plaintiff advised Francis of this fact. Francis told the plaintiff to help the trainee get caught up. The plaintiff injured his right shoulder doing this. The plaintiff did not

14

say anything that night because he thought it would be alright.

80.     On or about November 17, 2006, the plaintiff's shoulder was still bothering him so he spoke to Francis and told him that he would like to report it and that he would like to see a doctor that morning.  Francis asked whether the plaintiff was suffering from "old age" and sent him on the road without allowing him to see a doctor.  The plaintiff was assigned to train a new helper for four (4) hours delivering packages.  When the plaintiff finished at 2:30 and returned to the building, Francis wanted to sit down and do an injury investigation with him.  At approximately 4:15 Francis gave the plaintiff permission to report the injury.

81.     The plaintiff called the injury in and received the confirmation number.

82.     On or about November 17, 2006, immediately after obtaining the injury confirmation number, Francis told the plaintiff that his boss, Slaybaugh,  told him to tell the plaintiff that they no longer had a job for him and that he should go home and wait for a phone call from Slaybaugh.

83.     The plaintiff was therefore fired on November 17, 2006.

84.     Apparently, Slaybaugh had sent Francis out with Mike Negron from the security department on November 17, 2006, to spy on the plaintiff and to take pictures of anything the plaintiff did wrong.  This was done in response and in retaliation to the plaintiff's complaints of age discrimination and of an injury.

85.     On Tuesday, November 21, 2006, Francis called while the plaintiff was sleeping.  Francis spoke with the plaintiff's wife, Diane,  and asked how he was doing.  The plaintiff returned his call at 8:00 am the next morning.  Francis told the plaintiff that Slaybaugh wanted to have a meeting with him.  The plaintiff explained it would be difficult due to the fact that the

doctor did not want the plaintiff to drive. Francis suggested that the plaintiff take public transportation. This would have been an extreme hardship.

86.     At that point he said he was going to call Slaybaugh to let him know what was happening. Francis then told the plaintiff to sit tight and that he would call back in 5 minutes. He never called back.

87.     The plaintiff was out of work thereafter.

88.     It was never clear if there was any opportunity for the plaintiff to get his job back.

89.     The plaintiff was fired right after he called in an injury that took place while working.

90.     During the plaintiff's absence, he had been continually harassed. For instance, the plaintiff received a telephone call demanding that he report to the UPS Center the next morning at 7:00 am.

91.     The plaintiff called back and left a message that he could not report in person but that he would be willing to speak over the telephone. The message was not returned.

92.     Instead, the plaintiff received an undated letter on December 9, 2006, threatening him with job abandonment.

93.     During that time, the plaintiff made every effort to keep UPS informed regarding his injuries and was never uncooperative.

94.     The plaintiff was treated in a disparate manner due to age and the injuries that he sustained on the job. UPS also regarded the plaintiff as disabled. The plaintiff's complaints of age discrimination and disability prompted UPS to retaliate against him. The plaintiff has suffered economic and emotional damages.

95.     But for the plaintiff's age, he would not have been the victim of discrimination.

96.     But for the plaintiff's disability, he would not have been the victim of discrimination.

97.     But for the fact that the plaintiff complained of discrimination, he would not have been subjected to retaliation in the workplace.

98.     The fact that the plaintiff suffers from a disability was a motivating factor for the decision to harass the plaintiff up to and including his termination from his employment.

99.     The plaintiff was perceived by his employer as disabled.

100.    That perception served as a motivating factor for the decision to harass the plaintiff and terminate his employment.

101.    As a result of the above, the plaintiff has been caused to suffer substantial economic and emotional damages.

## AS AND FOR A FIRST CAUSE OF ACTION
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

102.    Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "101" of the Complaint as if more fully set forth herein.

103.    The plaintiff suffers from a disability as defined by the Americans With Disabilities Act.  The plaintiff suffers from a work-related injury to his shoulder, neck and back which affects his ability to drive, lift or carry anything. The plaintiff suffered from emphysema. The plaintiff was also regarded as disabled.

104.    The defendant employs in excess of twenty five (25) employees.

105.    The plaintiff's employment was terminated while he was out of work on disability leave.

17

106.    After learning of the plaintiff's disability, the defendant sought to harass, ridicule and intimidate the plaintiff.

107.    The defendant failed to afford the plaintiff a reasonable accommodation which had the expectation of being successful.

108.    The plaintiff was also treated in a manner unlike and inferior to other people who were not suffering from the same disability inasmuch as his employment was terminated as a result of a perceived inability to perform his job functions in the future.

109.    As a result thereof, the defendant has discriminated against the plaintiff based upon his disability.

110.    As a result of the defendant's wrongful conduct, the plaintiff has been caused to suffer severe economic and emotional damages in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A SECOND CAUSE OF ACTION
### NEW YORK EXECUTIVE LAW § 296 - DISABILITY

111    Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "110 with the same force and effect as if set forth more fully herein.

112    The plaintiff suffers from a disability as defined by the New York State Executive Law §296 et seq.  The plaintiff suffers from a work-related injury to his shoulder, neck and back which affects his ability to drive, lift or carry anything. The plaintiff suffered from emphysema. The plaintiff was also regarded as disabled.

113    The defendant employs in excess of twenty five (25) employees.

114    The plaintiff's employment was terminated while he was out on disability leave.

115.    After learning of the plaintiff's disability, the defendant sought to harass, ridicule

and intimidate the plaintiff.

116.    The defendant failed to afford the plaintiff a reasonable accommodation which had the expectation of being successful.

117.    The plaintiff was also treated in a manner unlike and inferior to other people who were not suffering from the same disability inasmuch as his employment was terminated as a result of a perceived inability to perform his job functions in the future.

118.    As a result thereof, the defendant has discriminated against the plaintiff based upon his disability.

119.    As a result of the defendant's wrongful conduct, the plaintiff has been caused to suffer severe economic and emotional damages in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

**AS AND FOR A THIRD CAUSE OF ACTION**
**NEW YORK CITY CODE § 8-107 - DISABILITY**

120.    Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "119" with the same force and effect as if set forth more fully herein.

121.    The plaintiff was discriminated against based upon disability in violation of the Administrative Code of the City of New York §8-107.

122.    This adverse employment action on the part of the defendant was motivated by plaintiff's status as a disabled person.  The adverse employment action was also motivated by the fact that the plaintiff was regarded as disabled.

123.    This discrimination violates the  Administrative Code of the City of New York §8-107.

124.    Plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00)

DOLLARS.

## AS AND FOR A FOURTH CAUSE OF ACTION
## IN VIOLATION OF THE ADA - RETALIATION

125.    Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs "1" through "124" with the same force and effect as if set forth more fully herein.

126.    The defendant has discriminated against the plaintiff on the basis of plaintiff's complaints of, and in opposition to, discrimination on the basis of disability.

127.    As a result of the plaintiff's complaints, he was subjected to disparate treatment.

128.    The plaintiff's employment was terminated due to his complaints of, and opposition to, discrimination on the basis of disability.

129.    The plaintiff's complaints of, and in opposition to, disability discrimination were motivating factors for the adverse employment action taken against the plaintiff.

130.    At all relevant times the plaintiff performed his duties in a satisfactory manner.

131.    The unfair treatment was unwanted and unwelcome by the plaintiff.

132.    A reasonable person would have found that the manner in which the plaintiff was treated was unreasonable.

133.    The actions of the defendant were of a nature that would dissuade a reasonable employee from making or supporting a charge of discrimination.

134.    The plaintiff has been caused to suffer severe economic and emotional damages as a result of this conduct.

135.    The defendant has discriminated against the plaintiff with respect to his employment terms, working conditions and privileges of employment in violation of the Americans with Disabilities Act.

136.    But for the plaintiff's complaints of, and opposition to, disability discrimination, the plaintiff would not have been subjected to discrimination and retaliation.

137.    As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

**AS AND FOR A FIFTH CAUSE OF ACTION
IN VIOLATION OF THE NYS EXECUTIVE LAW § 296 - RETALIATION**

138.    Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs "1" through "137" with the same force and effect as if set forth more fully herein.

139.    The defendant has discriminated against the plaintiff on the basis of plaintiff's complaints of, and in opposition to, discrimination on the basis of disability.

140.    As a result of the plaintiff's complaints, he was subjected to disparate treatment.

141.    The plaintiff was ultimately constructively discharged from his employment due to his complaints of, and in opposition to, discrimination on the basis of disability.

142.    The plaintiff's complaints of, and in opposition to, disability discrimination were motivating factors for the adverse employment action taken against the plaintiff.

143.    At all relevant times the plaintiff performed his duties in a satisfactory manner.

144.    The unfair treatment was unwanted and unwelcome by the plaintiff.

145.    A reasonable person would have found that the manner in which the plaintiff was treated was unreasonable.

146.    The actions of the defendant were of a nature that would dissuade a reasonable employee from making or supporting a charge of discrimination.

147.    The plaintiff has been caused to suffer severe economic and emotional damages as a result of this conduct.

148.    The defendant has discriminated against the plaintiff with respect to his

employment terms, working conditions and privileges of employment in violation of the New

York State Executive Law §296 et seq.

149.    But for the plaintiff's complaints of, and opposition to, disability discrimination,

the plaintiff would not have been subjected to discrimination and retaliation.

150.    As a result of the defendant's conduct, plaintiff has been damaged in the sum of

FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A SIXTH CAUSE OF ACTION
## IN VIOLATION OF THE NEW YORK CITY ADMINISTRATIVE CODE §8-107 - RETALIATION

151.    Plaintiff repeats, reiterates and realleges each of the allegations contained in

paragraphs "1" through "150" with the same force and effect as if set forth more fully herein.

152.    The defendant has discriminated against the plaintiff on the basis of plaintiff's

complaints of, and in opposition to, discrimination on the basis of disability.

153.    As a result of the plaintiff's complaints, he was subjected to disparate treatment.

154.    The plaintiff was ultimately constructively discharged from his employment due

to his complaints of, and in opposition to, discrimination on the basis of disability.

155.    The plaintiff's complaints of, and in opposition to, disability discrimination were

motivating factors for the adverse employment action taken against the plaintiff.

156.    At all relevant times the plaintiff performed his duties in a satisfactory manner.

157.    The unfair treatment was unwanted and unwelcome by the plaintiff.

158.    A reasonable person would have found that the manner in which the plaintiff was

treated was unreasonable.

159.    The actions of the defendant were of a nature that would dissuade a reasonable employee from making or supporting a charge of discrimination.

160.    The plaintiff has been caused to suffer severe economic and emotional damages as a result of this conduct.

161.    The defendant has discriminated against the plaintiff with respect to his employment terms, working conditions and privileges of employment in violation of the New York City Administrative Code §8-107.

162.    But for the plaintiff's complaints of, and opposition to, disability discrimination, the plaintiff would not have been subjected to discrimination and retaliation.

163.    As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT

164.    Plaintiff repeats and reiterates and realleges the allegations contained in paragraphs "1" through "163" with the same force and effect as if set forth more fully herein.

165.    The defendant has discriminated against the plaintiff on the basis of plaintiff's age in terminating his employment.

166.    The defendant's conduct was motivated by the plaintiff's age.

167.    The defendant has wilfully discriminated against the plaintiff with respect to defendant's failure to allow the plaintiff to work in an environment free from discrimination in violation of the Age Discrimination in Employment Act.

168.    But for plaintiff's age, he would not have been subjected to the adverse work environment and been discriminated against by the defendant.

23

169.    As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## IN VIOLATION OF THE NYS EXECUTIVE LAW § 296 - AGE DISCRIMINATION

170.    Plaintiff repeats and reiterates and realleges the allegations contained in paragraphs "1" through "169" with the same force and effect as if set forth more fully herein.

171.    Defendant has intentionally and/or willfully discriminated against the plaintiff in terminating his employment on the basis of his age.

172.    Defendant has discriminated against the plaintiff with respect to his employment.

173.    Said discrimination is unlawful pursuant to New York Executive Law § 296.

174.    The defendant knew or had reason to believe that the plaintiff would suffer extreme emotional distress, anxiety and humiliation as a result of the defendant's conduct.

175.    Plaintiff has suffered severe emotional distress, anxiety and humiliation as a result of the conduct of the defendant.

176.    As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A NINTH CAUSE OF ACTION
## IN VIOLATION OF THE NYC ADMINISTRATIVE CODE - AGE DISCRIMINATION

177.    Plaintiff repeats and reiterates and realleges the allegations contained in paragraphs "1" through "176" with the same force and effect as if set forth more fully herein.

178.    Defendants have intentionally and/or willfully discriminated against the plaintiff in terminating his employment on the basis of his age.

179.    Defendant has discriminated against the plaintiff with respect to his employment.

24

180.    Said discrimination is unlawful pursuant to the New York City Administrative Code §8-107.

181.    The defendant knew or had reason to believe that the plaintiff would suffer extreme emotional distress, anxiety and humiliation as a result of the defendant's conduct.

182.    Plaintiff has suffered severe emotional distress, anxiety and humiliation as a result of the conduct of the defendant.

183.    As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

**AS AND FOR A TENTH CAUSE OF ACTION**
**AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA) - RETALIATION**

184.    Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "183" with the same force and effect as if set forth more fully herein.

185.    The defendant has discriminated against the plaintiff in retaliation for his complaint of age discrimination.

186.    The plaintiff's employment was terminated due to his complaint of age discrimination.

187.    The defendant's conduct was motivated by the plaintiff's age.

188.    But for the plaintiff's complaint of age discrimination, he would not have been terminated from his employment.

189.    As a result of the defendant's conduct, the plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
## NEW YORK STATE EXECUTIVE LAW § 296 - RETALIATION

190.     Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "189" with the same force and effect as if set forth more fully herein.

191.     The defendant has discriminated against the plaintiff in retaliation for his complaint of age discrimination.

192.     The plaintiff's employment was terminated due to his complaint of age discrimination.

193.     The defendant's conduct was motivated by the plaintiff's age.

194.     But for the plaintiff's complaint of age discrimination, he would not have been terminated from his employment.

195.     As a result of the defendant's conduct, the plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A TWELFTH CAUSE OF ACTION
## NEW YORK CITY ADMINISTRATIVE CODE - RETALIATION

196.     Plaintiff repeats, reiterates and realleges the allegations contained in paragraphs "1" through "195" with the same force and effect as if set forth more fully herein.

197.     The defendant has discriminated against the plaintiff in retaliation for his complaint of age discrimination.

198.     The plaintiff's employment was terminated due to his complaint of age discrimination.

199.     The defendant's conduct was motivated by the plaintiff's age.

200.     But for the plaintiff's complaint of age discrimination, he would not have been

terminated from his employment.

201.     As a result of the defendant's conduct, the plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

**JURY DEMAND**

202.     Plaintiff demands a jury trial of this action.

**WHEREFORE**, plaintiff demands judgment as follows:

a)     Declaring that the actions, patterns and practices of the defendant, its agents, servants and all those acting in concert with them, constituted, and does constitute, a violation of the Americans with Disabilities Act; the Age Discrimination in Employment Act; the New York State Constitution; the New York State Executive Law Section 290 et seq., The New York City Administrative Code Section 8-107, and all applicable rules and regulations, and common law principals.

b)     Permanently enjoining the defendant, its agents, servants and all those acting in concert with them, from violating the Americans with Disabilities Act; the Age Discrimination in Employment Act; the New York State Constitution; the New York State Executive Law Section 290 et seq.;  The New York City Administrative Code Section 8-107 and all applicable rules and regulations, and common law principals.

c)     Awarding damages for economic and emotional injuries as well as interest, costs, disbursements, common law, statutory, compensatory, exemplary and punitive damages, pre-judgment interest, pecuniary and non-pecuniary damages and such other and further relief as to

this Court deems just and proper; and

       d)     Awarding counsel fees, costs and disbursements of this action.

       Together with such other and further equitable relief which as to this Court may seem just

and  proper.


Dated: Garden City, New York
       November 16, 2007

                       Yours etc.,


                       _____s/_____
                       DAVID G. GABOR (DGG9979)
                       GABOR & GABOR
                       Attorneys for Plaintiff
                       400 Garden City Plaza
                       Suite 406
                       Garden City, New York 11530
                       (516) 248-2525