Jonathan L. Sulds (JS-4674)
Jonathan L. Israel (JI-5882)
Lauren H. Leyden (LL-0937)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022
(212) 872-1000 (tel)
(212) 872-1002 (fax)
(212) 872-1002 (fax)
E-mail:  jsulds@akingump.com
        jisrael@akingump.com
        lleyden@akingump.com

*Attorneys for Defendant United Parcel Service, Inc.*

David G. Gabor (DG-9979)
Gabor & Gabor
400 Garden City Plaza, Suite 406
Garden City, New York 11530
(516) 248-2525 (tel)
(516) 248-4468 (fax)
*Attorneys for Plaintiff William
O'Brien*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

WILLIAM O'BRIEN,                              :

                                             :     No. CV-07-10437 (LTS)

                                             :

                        Plaintiff,           :

                                             :

          -against-                          :

                                             :

UNITED PARCEL SERVICE INC.,                  :

                                             :

                        Defendant.           :

------------------------------------------------------------------x


## PRELIMINARY PRE-TRIAL STATEMENT

In accordance with the Court's Initial Conference Order, as well as Rules 16(b) and 26(f) of the Federal Rules of Civil Procedure, the parties have conferred for the purpose of preparing and proposing this joint preliminary pre-trial statement, and subject to revisions and amendments of facts and legal argument as to the law that may be determined following discovery submit as follows:

1.      <u>Statement of the Nature of this Action</u>.  Plaintiff claims that Defendant UPS unlawfully discriminated against Plaintiff on the basis of his age and his alleged disability or

perceived disability in violation of the federal Age Discrimination in Employment Act

("ADEA"), the Americans with Disabilities Act ("ADA"), the New York State Human Rights

Law and the New York City Human Rights Law. Plaintiff claims that Defendant UPS

unlawfully denied his alleged requests for reasonable accommodations in violation of the federal,

state and city law disability laws. Plaintiff also alleges that he was retaliated against by

Defendant UPS for complaining to his managers about the discriminatory treatment he claims to

have received. Defendant UPS denies that it ever unlawfully discriminated or retaliated against

Plaintiff, and maintains that Plaintiff did not seek an accommodation and would not have been

entitled to the accommodations he claims to have sought.

      2.    <u>Jurisdiction</u>. Plaintiff claims jurisdiction is conferred on the Court by 28 U.S.C.

1331 and 28 U.S.C.1343 and that the Court has pendent and supplemental jurisdiction pursuant

to 28 U.S.C. 1367 based on Plaintiff's State and City law claims. Defendant UPS does not

object to the Court's jurisdiction.

      3.    <u>Material Uncontested or Admitted Facts</u>. Plaintiff was born on December 24,

1955. Plaintiff was hired by Defendant UPS in June 1987 as a package car driver in the Metro

New York District. Plaintiff's last position with Defendant UPS was an Operations Supervisor.

In February 2003, Plaintiff worked for Chester Slaybaugh, then the UPS Manhattan East Center

Manager. Around this time, Mr. Slaybaugh was critical of Plaintiff's job performance and told

Plaintiff that UPS package car drivers were complaining about him. In or around Fall 2003,

Plaintiff was transferred to the UPS Pelham Bay Center resulting in no change to his job title,

compensation or duties.

In or about February 2005, Mr. Slaybaugh was promoted to Division Manager. In

September 2005, Plaintiff was temporarily assigned to the UPS Fordham Center due to staffing

shortages. In Summer 2006, Plaintiff had an annual career discussion meeting with Mr. Slaybaugh and UPS Center Manager Tom Gilmartin. In or around July 2006, Plaintiff was transferred to the UPS New Rochelle Center in the Mount Vernon building resulting in no change to Plaintiff's job title, compensation or duties. Around this time, UPS package car driver Robert Blackmore was involved in an accident, while operating a UPS package car, when he made a turn going the wrong direction on a one way street. As part of UPS's investigation into Mr. Blackmore's accident, Mr. Slaybaugh, UPS Security Manager Michael Abaitello and UPS Risk Manager Steven Foy met with Plaintiff to discuss his training of Mr. Blackmore. During these meetings, Plaintiff was asked to respond to Mr. Blackmore's accusation that Plaintiff had made the same turn going the wrong direction on the same one way street while training Mr. Blackmore.

On or about September 1, 2006, Mr. Slaybaugh told Plaintiff he could not tolerate a management person doing things that jeopardized the safety in his division and Plaintiff was sent home from work. A few days later, Plaintiff attended a meeting with Mr. Slaybaugh and UPS Human Resource Manager Henry Beards. At the end of this meeting Plaintiff was told he could keep his job but that he would not be receiving his management incentive award for the year.

On November 16, 2006, Plaintiff did not report an injury to anyone at UPS. On November 17, 2006, Plaintiff called in an injury and received a confirmation number. Plaintiff was sent home from work on November 17, 2006. UPS Center Manager Thomas Francis called Plaintiff after November 17, 2006. UPS sent Plaintiff a letter in December 2007, stating that if he did not report to work or contact his Division Manager by Monday December 11, 2006, UPS would have to consider Plaintiff as voluntarily abandoning his job. Plaintiff never returned to work after November 17, 2006. Plaintiff received disability benefits and salary continuation

while he was out of work on disability leave.  On December 10, 2007, Plaintiff's employment

with UPS was terminated.

    4.    Uncontested legal issues.  The parties do not contest jurisdiction, venue or

standing.

    5.    Legal Issues.  The legal issues to be decided by the Court are (a) whether or not

Plaintiff has established a prima facie case for discrimination on the basis of disability and age,

(b) whether Plaintiff was a qualified individual with a disability, (c) whether Plaintiff could

perform the essential functions of the job (d) whether or not the plaintiff was regarded as

disabled (e) whether or not the plaintiff's medical condition meets the definition under New

York State Law which defines "disability" in pertinent part as [a] a physical, mental or medical

impairment resulting from anatomical, physiological, genetic or neurological condition which

prevents the exercise of a normal bodily function or is demonstrable by medically accepted

clinical or laboratory diagnostic techniques, or [b] a record of such an impairment, or [c] a

condition regarded by others as such an impairment, (f) whether the plaintiff's medical condition

satisfies his burden to establish a disability under New York City Administrative Code §§ 8-107

and 8-502, more particularly § 8-107(1)(b) and 8-107(15) which provide that the plaintiff must

show he has a condition  "demonstrable by medically accepted clinical or laboratory diagnostic

techniques (g) whether or not Defendant UPS has articulated a legitimate non-discriminatory

reason for its actions, (h) whether or not Defendant UPS's legitimate non-discriminatory reason

is pretext for discrimination, and (i) whether or not Plaintiff can establish a retaliation claim by

showing participation in a protected activity that was known to Defendant UPS, an employment

action disadvantaging the Plaintiff, and a causal connection between the activity and the adverse

employment action.

6.    <u>Material Disputed Facts</u>.

<u>Plaintiff</u>:  The employment decisions made by the defendant concerning the Plaintiff's employment were not based on legitimate, non-discriminatory reasons.  Decisions made by the defendant concerning the terms and conditions of the plaintiff's employment were motivated by, among other things, age, the Plaintiff's physical condition and retaliation for prior complaints of discrimination.

In February 2003, the Plaintiff met with Slaybaugh regarding a request for a transfer. The Plaintiff explained that he was forty-seven (47) years old and that he was not sure how much longer he would be able to work as an On-Car Supervisor and requested a transfer to tractor trailers.  The Plaintiff has maintained a Class A License since 1977.  The Plaintiff also explained that he was diagnosed with emphysema and that it would only get worse over time.  Slaybaugh told the plaintiff that he would try but that the Plaintiff should not count on anything.  From that point forward, Slaybaugh began to micro-manage the Plaintiff and to second guess everything that the plaintiff did.

In February 2003, Slaybaugh followed the Plaintiff while the Plaintiff was conducting on-the-job supervision.  Slaybaugh spent fifteen (15) minutes with the team and then left.  The following day, the Plaintiff was called to Slaybaugh's office where he handed the Plaintiff a memo that he had written to Pat Sheppard, who was then the Division Manager concerning his observations of the Plaintiff's on-the-job supervision.  The memo was extremely critical of the Plaintiff and the methods that he used.  It would not have been possible to draw all of the conclusions that he reached in the fifteen (15) minutes that he spent observing the Plaintiff's style of supervision of his subordinates.  This was the first time that the Plaintiff received a warning about his performance.  This action effectively initiated the disciplinary process against the Plaintiff.

Slaybaugh unfairly criticized the Plaintiff with regard to his style of supervision of a problem driver in or about March 2003. That particular driver had chronic attendance and production issues. The Plaintiff did the best that he could with the driver. Slaybaugh went out with the driver for three (3) days, eliminated some difficult stops and still failed to achieve better results. Nevertheless, the Plaintiff was criticized for the handling of that driver.

In May of 2003, Slaybaugh told the Plaintiff that he was totally dissatisfied with the Plaintiff's performance and that drivers were complaining about him. Slaybaugh then told the Plaintiff that when Pat Sheppard got back from his special assignment, they would be discussing the Plaintiff's future with UPS.

In June 2003, the Plaintiff had a meeting with Slaybaugh and Sheppard. During the meeting, Slaybaugh tried to conjure up false accusations against the Plaintiff and disparaged the Plaintiff's job performance. However, no specifics were even mentioned. Sheppard explained that he relied on input from the Plaintiff's Manager, Slaybaugh.

In July 2003, the Plaintiff was called into Slaybaugh's office on the Friday before a scheduled vacation whereupon Slaybaugh told the Plaintiff that when the Plaintiff got back from vacation he was being reassigned to the Brush Avenue facility in the Bronx. Slaybaugh did not know which center the Plaintiff was assigned to and that the Plaintiff should call him during vacation to find out. The Plaintiff had to call Slaybaugh three (3) times during vacation before he would tell the Plaintiff that he should report back to the Manhattan North building on Monday to run the night sort for vacation coverage.

That Friday, the Plaintiff was told to report to Brush Avenue the following Monday, where the Plaintiff would be meeting with Ed Harding, the Center Manager of the Pelham Bay Center. Slaybaugh then said that the Plaintiff was, "at best, a mediocre supervisor, middle of the pack, nothing more."

6

The Plaintiff reported at 7:00 am on Monday, as instructed, and met with Harding. After dispatch, the Plaintiff met with Harding and Sheppard during which time the Plaintiff was told that he was reassigned as part of a "swap." The person who was "swapped" with the Plaintiff was, upon information and belief, forced to resign six (6) months afterwards. He had been with UPS for twenty-six (26) years. The Plaintiff's new team consisted of the Manager and three (3) Supervisors. The Manager was approximately 40 years of age. One of the Supervisors, Rich Leblanc, approximately 45 years of age, was an individual with whom the Plaintiff had never worked before. The other Supervisor, Manny Pujol, approximately 38 years of age, was an individual with whom the Plaintiff had previously worked. Pujol was transferred shortly thereafter. Pujol was replaced by Garland Dalton, approximately 25 years of age.

Due to the change in structure, there was no one to fill in for Harding when he was out of the office. The Plaintiff volunteered to cover for Harding when he was out. Harding and Sheppard told the Plaintiff that they liked the way that he ran the center when Harding was away.

In September 2003, Harding and Sheppard had a discussion regarding the need to conduct an "OJS" of Alexandro Anduhar, a poor performer who was averaging only twelve (12) stops per hour. "OJS" stands for on the job supervision. It is necessary to supervise the driver for three (3) days during which time the driver is supposed to work with the supervisor nonstop. He had been "OJS" previously to 14.6 stops per hour. The Plaintiff volunteered to conduct the OJS. For the next three (3) days that driver averaged 15.9 stops per hour.

In early 2004, production was below expectation at the center where the Plaintiff was stationed. Heavy snowfall made it even more difficult to improve on production. Harding, Sheppard and the Plaintiff agreed that the Plaintiff should continue to perform OJS's. In each instance the driver's production improved. As a result of the Plaintiff's efforts, drivers were held accountable for increased production. The Plaintiff was the only supervisor holding people

accountable at the center which resulted in issues concerning demands. At the same time, increasing productivity resulted in substantial savings to UPS in payroll. Upon information and belief, the Plaintiff was either the only one, or one of very few, Managers and Supervisors who was not requested to attend the training session based upon experience and past results.

In or around June and July 2005, the Plaintiff was requested to conduct an OJS for a driver who had signed for a route and was well below standards for production. At the end of the OJS the driver's production improved from between 11.5 and 12.0 stops per hour, to 14.7 stops an hour. Slaybaugh was the only management official who was critical of the Plaintiff's work with this driver.

In or about Spring 2005, Dennis O'Sullivan was moved into the Plaintiff's division. Several tactical decisions made by Slaybaugh, over the objection of Harding, resulted in a dramatic increase in the compensation rate. This caused the Center to fall short on goals set by Slaybaugh. Upon information and belief, Slaybaugh made these tactical decisions to doom Harding and the plaintiff to failure. As a result, Ed Harding resigned after more than 20 years of service with UPS. It is believed that Harding was forced out by Slaybaugh due to age.

Harding was replaced by Tom Gilmartin who had been a Manager in the Yorktown building.

During November and December 2005, there were two (2) drivers under the Plaintiff's supervision who had problems with their work performance. The drivers were averaging between 7 to 10 stops per hour. Whenever the Plaintiff spent time with either one of them, their production doubled. One of the drivers was fired for theft of services the week before Christmas. Gilmartin requested that the Plaintiff train the other driver in or around January 2006. The plaintiff retrained both drivers.

When a driver had too much work, the Plaintiff would "run cover," which is support that is given to a driver with an extremely large load. The Plaintiff worked with Mueller, a driver, with less than six (6) months experience and had received many customer complaints, had constant production issues and had gotten into several arguments with other drivers. Mueller was approximately 24 years of age.

In February 2006, the Plaintiff was out with Mark Martinez running cover when the Plaintiff received a call from Gilmartin that Mueller sent a message that he would not be finished with his route until midnight. The plaintiff and Martinez worked hard to complete the route. A couple of hours later, they were told that Mueller had sent another message saying that his estimated completion time was 10:00 pm. The Plaintiff and Martinez pulled up to Mueller's truck at about 6:00 pm. Mueller had turned his vehicle off, but had left his 4-way flashers and headlights on and his battery was almost dead. His vehicle was a mess. The plaintiff and Martinez took another 20 stops from Mueller and reset his load in the proper order. When Mueller finally returned to the building at 9:00 pm, the Plaintiff discovered that there were 56 packages brought back by him. Of the 56 packages, 28 were never attempted but were falsely recorded as "no such address." Copies of the falsified papers were placed in his file. The next morning Slaybaugh met with the business agent, the steward and Mueller. Slaybaugh then allowed Mueller to disparage the Plaintiff without any repercussions. After about 10 minutes Slaybaugh turned to the Plaintiff and said, "What do you have to say for yourself?" The Plaintiff took out Mueller's file and began to review the 28 falsified package records one at a time. Everyone sat and squirmed. The steward spoke with Martinez who corroborated the Plaintiff's story.

In September 2005, the Plaintiff handled deliveries for the Fordham center due to staffing shortages. This was the first time that the Plaintiff had handled that particular route. The first

stop was a school where there were approximately 45 packages to deliver including 20 and 50 lb packages of text books. The boxes were stacked to the top of the door. The Plaintiff took the first package and placed it on the hand truck. At that moment the entire wall of packages fell on the Plaintiff and injured his neck and left shoulder. The Plaintiff notified Dennis O'Sullivan, the Manager from the center, that he was covering that day and about the injury. O'Sullivan notified Slaybaugh who proceeded to call the Plaintiff on his cell phone. The Plaintiff told Slaybaugh that he needed medical attention. After a long pause on the other end of the phone, Slaybaugh said that the Plaintiff should continue working and that he would send another supervisor. The Plaintiff was never relieved of his duties that day in order to see a doctor. The Plaintiff returned to the building at approximately 10:00 pm that night. O'Sullivan had come out to the Plaintiff on the road to check on his progress, but never asked how the Plaintiff felt. Later that day, the Plaintiff was criticized for not completing the route faster. Gilmartin filled out an injury prevention report about the incident. Apparently, the injury was not called in which was inconsistent with UPS practice. As a result, the Plaintiff continued to work which aggravated the injury. The Plaintiff was concerned about retribution and chose to treat with physicians through his medical plan. The injury caused the Plaintiff to suffer three (3) herniated discs and three (3) bulging discs. The Plaintiff was also told that it seemed like he had tendinitis.

In July 2006, the Plaintiff was called into Slaybaugh's office along with Gilmartin regarding the Plaintiff's career development review. The meeting began with Slaybaugh asking the Plaintiff how many years he had left with the company. During the meeting, the Plaintiff requested a reassignment to security or district safety instructor. Slaybaugh refused to consider the plaintiff for either position. The Plaintiff told Slaybaugh that he had had a class A license for the previous twenty nine (29) years and would do very well working nights in the trailer department. Slaybaugh said there was no room because of downsizing. Toward the end of the

meeting, Gilmartin brought up the possibility of promoting the Plaintiff to Manager. Slaybaugh said that he would never consider the Plaintiff for a promotion. However, Slaybaugh did admit that the Plaintiff met all of the requirements for a promotion. Gilmartin was extremely supportive of promoting the plaintiff to manager.

Shortly thereafter, Gilmartin took a vacation. During Gilmartin's vacation, Slaybaugh called the Plaintiff into a meeting with a fellow Supervisor and advised the Plaintiff that he was to report to the Mount Vernon building effective immediately. The Plaintiff called Gilmartin later that day. Gilmartin had no idea about the transfer and was upset that he had not been told in advance or even consulted.

The Plaintiff reported to the New Rochelle center where there was only one supervisor. The manager, Nava Gnessen had recently been promoted to Division Manager. There was no manager and the other supervisor, Joe Reynolds, was on vacation. Mark Lisowski was the only management person available, so the Plaintiff reported to him. Tommy Francis was named the new Manager of the center.

In July, 2006, the Plaintiff received a call from Rich LeBlanc who told him that Blackmore had an accident while driving up 214th Street and instead of going right at Barnes Avenue he made an illegal left turn and hit a kid coming down 214th Street from the opposite direction on a skate board. He told the Plaintiff that Blackmore indicated in the investigation that he was trained by the Plaintiff to go that direction. The next day, the Plaintiff was questioned by Steve Foy who is a Manager in the Safety Department. The Plaintiff told Foy that he did not recall the intersection, but assured him that he would never train any employee to make an illegal maneuver. Foy told the Plaintiff that Slaybaugh had said to him that Slaybaugh would talk to the Plaintiff and request a write up of the training that Blackmore received. On the following Monday, Slaybaugh called the Plaintiff to ask for the write up on the accident. The Plaintiff did

the write up and sent it to him by e-mail. The following day, Mike Abatelo, a Manager from the Security Department met with the Plaintiff for approximately forty-five (45) minutes regarding the Blackmore accident. Abatelo seemed satisfied with all of the answers that the Plaintiff gave and said that his meeting should conclude the Plaintiff's involvement with the accident. Abatelo further indicated that he could not see where the Plaintiff had done anything wrong.

Immediately after that meeting, Slaybaugh cornered the Plaintiff and began to grill him about the accident. Slaybaugh said that he did not believe a word that the Plaintiff said. He said , "I think that you're lying." At that moment Abatelo walked into Slaybaugh's office and sat down. The Plaintiff asked Abatelo for delivery records of the days that the Plaintiff had trained Blackmore. The Plaintiff and Abatelo had reviewed all of the records for the five (5) days that the Plaintiff was with Blackmore. There was no evidence that Blackmore and the Plaintiff had ever had the need to cross over Barnes Avenue. This clearly showed that the Plaintiff would have had no reason to tell Blackmore to make an illegal turn. This was proof that the Plaintiff had done nothing wrong. Abatelo went up to Slaybaugh's office after that. He returned downstairs about fifteen (15) minutes later and told the Plaintiff that Slaybaugh still demanded an additional write up from the Plaintiff and that he would probably be interviewed again. The next day, the Plaintiff was summoned to Slaybaugh's office at Brush Avenue at noon. The Plaintiff had to wait for thirty (30) minutes for the meeting to begin. Slaybaugh then proceeded to grill the Plaintiff for an hour and 15 minutes by asking the same questions over and over again. He took out Blackmore's training packet. Slaybaugh accused the Plaintiff of falsifying the packet. There were some entries for driving training that had the same date on them. The Plaintiff told Slaybaugh that there were 2 separate packets and that Brian McQuade, a Supervisor, went out with him one day and lost the original packet. Slaybaugh did not believe the Plaintiff and got in touch with Gilmartin who corroborated what the Plaintiff had said. Gilmartin explained the

entire packet was recreated after the fact and reviewed with Blackmore in the office. It was evident that Slaybaugh wanted the Plaintiff to change his statement. It was clear that Slaybaugh was trying to find cause to fire the Plaintiff.

On or about September 1, 2006, Slaybaugh proceeded to harass the Plaintiff for no good reason. The Plaintiff was in his vehicle making notes about the work that he needed to do that day. Slaybaugh, for no legitimate reason, pulled up next to the Plaintiff and demanded that the Plaintiff reverse direction and go all the way around the block and make a u- turn on Boston Post Road. This did not make any sense. The Plaintiff then received a call from Jack McCarren, Manager of the Yonkers Center who told the Plaintiff that Slaybaugh wanted to see him at the Brush Avenue building immediately and that the Plaintiff should tell the other Supervisors that he would not be back that day. The Plaintiff arrived at Brush Avenue about a half hour later. Slaybaugh told the Plaintiff that he could not tolerate a management person doing things that jeopardized safety in his division. He then accused the Plaintiff of having a pattern of doing unsafe things in the workplace. Slaybaugh told the Plaintiff to go home because he no longer had a job. Slaybaugh said that he would be in touch with the Plaintiff.

Slaybaugh called the Plaintiff on Tuesday, September 5, 2006. He told the Plaintiff to report to the 43th street building on Wednesday September 6, 2006, by 9:00 am for a meeting with Henry Beards, the District Human Resources Manager. The Plaintiff arrived as instructed before 9:00 am and was forced to stand outside Beard's office for over an hour waiting for him. The Plaintiff finally met with Slaybaugh and Beards shortly after 10:00 am. Slaybaugh and Beards took turns berating the Plaintiff for the incident with Blackmore and falsely accused the plaintiff of lying. Slaybaugh kept saying that he did not have a job for the plaintiff. At the end of the meeting, the Plaintiff was told that he could keep his job but that he would not be receiving his management incentive award that year.

On several occasions after that, the Plaintiff witnessed the trailer drivers, mechanics, and carwashers drive down the street the same way the plaintiff had. Lisowski said that Slaybaugh had seen him drive the same way the day before the Plaintiff was fired. The Plaintiff brought this to the attention of both of the managers in the building. The Plaintiff made it clear that he felt that Slaybaugh had singled him out due to his age. The Plaintiff was told that the Defendant would not do anything to help him.

There happened to be an occasion when it was raining heavily and the air trailer arrived to the building after the drivers were dispatched. The driver traveled to the end of the block and turned around and drove the opposite way up the street and backed it into the building. Both of the managers, the shop steward, and the union co-chair of the safety committee witnessed this event. The Plaintiff approached the managers about it and they refused to discuss it with him. The driver said that trailer management told him to do it that way. This is akin to what Slaybaugh fired the Plaintiff for.

At the end of October, 2006, Abatelo refused to give the Plaintiff a copy of the Blackmore file that he requested. On or about November 16, 2006, the Plaintiff went to check on a trainee who was sent out on his own despite the Plaintiff's objections that the trainee was not ready. The Plaintiff was told by Tommy Francis, the Manager, to let the trainee go and to catch up with him at lunchtime. The Plaintiff caught up with the trainee at 12:30 pm and discovered that he had only done 15 stops. The Plaintiff advised Francis of this fact. Francis told the Plaintiff to help the trainee get caught up. The Plaintiff injured his right shoulder doing this. The Plaintiff did not say anything that night because he thought it would be alright.

On or about November 17, 2006, the Plaintiff's shoulder was still bothering him so he spoke to Francis and told him that he would like to report it and that he would like to see a doctor that morning. Francis asked whether the Plaintiff was suffering from "old age" and sent him on

14

the road without allowing him to see a doctor. The Plaintiff was assigned to train a new helper for four (4) hours delivering packages. When the Plaintiff finished at 2:30 and returned to the building, Francis wanted to sit down and do an injury investigation with him. At approximately 4:15 Francis gave the Plaintiff permission to report the injury. The Plaintiff called the injury in and received the confirmation number. On or about November 17, 2006, immediately after obtaining the injury confirmation number, Francis told the Plaintiff that his boss, Slaybaugh, told him to tell the Plaintiff that they no longer had a job for him and that he should go home and wait for a phone call from Slaybaugh.

The Plaintiff was effectively terminated on November 17, 2006. Apparently, Slaybaugh had sent Francis out with Mike Negron from the security department on November 17, 2006, to spy on the Plaintiff and to take pictures of anything the Plaintiff did wrong.

On Tuesday, November 21, 2006, Francis called while the Plaintiff was sleeping. Francis spoke with the Plaintiff's wife, Diane, and asked how he was doing. The Plaintiff returned his call at 8:00 am the next morning. Francis told the Plaintiff that Slaybaugh wanted to have a meeting with him. The Plaintiff explained it would be difficult due to the fact that the doctor did not want the Plaintiff to drive. Francis suggested that the Plaintiff take public transportation. This would have been an extreme hardship. At that point he said he was going to call Slaybaugh to let him know what was happening. Francis then told the Plaintiff to sit tight and that he would call back in 5 minutes. He never called back. The Plaintiff was out of work thereafter.

It was never clear if there was any opportunity for the Plaintiff to get his job back. The Plaintiff was fired right after he called in an injury that took place while working. During the Plaintiff's absence, he had been continually harassed. For instance, the Plaintiff received a telephone call demanding that he report to the UPS Center the next morning at 7:00 am. The Plaintiff called back and left a message that he could not report in person but that he

would be willing to speak over the telephone.  The message was not returned.  Instead, the Plaintiff received an undated letter on December 9, 2006, threatening him with job abandonment. During that time, the Plaintiff made every effort to keep UPS informed regarding his injuries  and was never uncooperative.

Defendant:  In February 2003, Mr. Slaybaugh was observing Plaintiff conduct an OJS on a driver.  The next day, Mr. Slaybaugh met with Plaintiff to review his assessment from his observations the day before and was critical of his performance.  Plaintiff was never formally disciplined in connection with this review.  However, Plaintiff continued to disagree with Mr. Slaybaugh over various work place issues, including how to approach training drivers and the appropriate disciplinary methods to use when drivers made mistakes.  At one point, Plaintiff asked Mr. Slaybaugh about the possibility of a transfer to another type of job.  Mr. Slaybaugh explained to him that Division Managers, not Center Manager such as himself, made the decisions about transfers.  Also around this time, Plaintiff told Division Manager at the time Mr. Sheppard about his desire to transfer to a different center location because he was unhappy with his commute.   In or around Fall 2003, Plaintiff was reassigned to the Pelham Center resulting in no change to Plaintiff's job title, compensation or duties.

In or around Spring 2005, UPS Center Manager Ed Harding resigned for personal reasons and Tom Gilmartin became Plaintiff's new Center Manager.  In or around September 2005, Plaintiff notified UPS Center Manager Dennis O'Sullivan that while he was covering at the UPS Fordham Center some packages had fallen in his vehicle.  Plaintiff stated that he was fine to continue working and did not report the injury to the UPS hotline.  In fact, Plaintiff did not report this alleged injury until in or around May, 2007.

Around July 2006, the UPS New Rochelle Center was short staffed and did not have enough On-Car Supervisors. Plainitff was selected to fill the vacancy. This transfer resulted in no change to Plaintiff's job title, compensation or duties. Tom Francis became Plaintiff's new Center Manager. In July 2006, a driver Plaintiff had trained while at the Pelham Center, Robert Blackmore, hit a pedestrian while driving his route and going the wrong way down a one way street. In accordance with procedure, UPS investigated the accident and interviewed Mr. Blackmore. Mr. Blackmore claimed that during his training he had observed Plaintiff commit the exact same safety violation at the same location. Over the next few weeks, Plaintiff was questioned on a number of occasions about Mr. Blackmore's training. Plaintiff was never disciplined or penalized in any way in connection with Mr. Blackmore's accident.

Then, on Friday September 1, 2006, Mr. Slaybaugh observed Plaintiff drive a UPS package car down a one way street in the wrong direction. Mr. Slaybaugh stopped Plaintiff on the road and questioned him about committing a very serious safety violation. Plaintiff explained that he had been in a hurry. Mr. Slaybaugh instructed Plaintiff that he had to follow the traffic rules at all time and go the correct way down the street. As a result of this misconduct, Plaintiff was directed to attend a meeting at UPS Human Resource Manager Henry Beard's office on or around September 5, 2006 to discuss whether there would be a penalty for his safety violation.

On or around September 5, 2006 a meeting was held at Mr. Beards' office with Plaintiff and Mr. Slaybaugh. Rather than respond when confronted with Mr. Slaybaugh's account of the events, Plaintiff complained that other UPS drivers commit the same safety violation all the time. Mr. Beards explained that this meeting was about the Plaintiff, not the drivers he supervised and that he was expected to set an example as a management person. At the end of the meeting,

Plaintiff was informed that he was being disciplined for the safety violation and as a result of his misconduct he would not be receiving a management incentive bonus at the end of the year.

On November 17, 2006, at the morning meeting, Mr. Francis assigned Plaintiff to train a new UPS driver helper. After the meeting, Plaintiff told Mr. Francis his shoulder was bothering him. Mr. Francis was previously unaware of any injury because Plaintiff had failed to report this alleged injury to anyone at UPS. Mr. Francis offered to take Plaintiff's place training the new driver helper so that he could leave to seek medical attention or work in the office if he wanted to rest his shoulder for the day. But Plaintiff refused. Instead he explained that he was fine but wanted to use an automatic package car rather than a stick shift one for the day. He also told Mr. Francis that he didn't think it was necessary to fill out an injury report, but that if his shoulder was still bothering him later he might so that he could go get it checked out by a doctor. So, Mr. Francis assigned him an automatic package car for the day and Plaintiff left the building to train the driver helper.

A short time later, Mr. Francis and Mr. McCarren observed Plaintiff driving with the back bulkhead door of the UPS package car open. Mr. Francis radioed Plaintiff and told him to close the bulkhead door immediately. When Plaintiff returned to the Center later that day, Mr. Francis asked him why the bulkhead door was open. Plaintiff first claimed it was broken. But, then admitted he did not call the repair department because the bulkhead door was not broken, he had just forgotten to close it. Mr. Francis also called Mr. Slaybaugh, to report that he had observed Plaintiff violating a safety rule. As a result of this misconduct, Plaintiff was told he was being sent home from work until he met with Mr. Slaybaugh and Mr. Beards again to discuss his repeated safety violations.

Over the next few weeks, Mr. Slaybaugh and Mr. Francis tried to contact Plaintiff to schedule a meeting to discuss his misconduct. But Plaintiff refused to attend the meeting or report to his regular work location. At this point UPS was still unaware of any reason for his absence except that he was avoiding disciplinary action based on his November 17th safety violation. So, Mr. Beards sent a letter to Plaintiff explaining that if he did not report to work or contact Mr. Slaybaugh by noon on December 11, 2006, UPS would consider him to have voluntarily abandoned his employment.

After receiving the letter, Plaintiff called Mr. Francis and Mr. Slaybaugh. He informed them of his alleged injury and promised to send medical documentation to support his absences from work. UPS Occupational Health Manager Qin Wang became involved now that UPS was aware of Plaintiff's alleged injury and she explained the process for filing for short-term disability benefits to Plaintiff. On December 12, 2006, Plaintiff faxed Ms. Wang a doctor's note designating him as totally disabled at the time. Plaintiff never returned to work and received disability benefits and salary continuation while on leave. Because Plaintiff did not indicate the ability or willingness to return to work 12 months after his first day of disability leave, he was administratively terminated on December 10, 2007 in accordance with UPS policy.

7.    <u>Legal Basis for Causes of Action</u>. Plaintiff states that this is a civil rights action brought in order to redress multiple deprivations by the Defendant of Plaintiff's rights secured by the Americans With Disabilities Act and the Age Discrimination in Employment Act.

Plaintiff states that the First Cause of Action is under the Americans With Disabilities Act based upon the fact that Mr. O'Brien suffers from a work-related injury to his shoulder, neck and back which affects his ability to drive, lift or carry anything. The Plaintiff states he suffered from emphysema. The Plaintiff states he was also regarded as disabled. The Plaintiff states the

Second Cause of Action is under New York State Executive Law §296. Plaintiff states this is based upon the same medical conditions as described above. The Plaintiff states the Third Cause of Action is under the Administrative Code of the City of New York §8-107.

The Plaintiff states the Fourth, Fifth and Sixth Causes of Action are for retaliation under the Americans With Disabilities Act, New York State and New York City Administrative Codes respectively.

Plaintiff states that the Seventh Cause of Action alleges unlawful discrimination under the Age Discrimination in Employment Act and the Eight Cause of Action is under New York State Executive Law §296. Plaintiff states that this is based upon age discrimination. The Plaintiff states that the Ninth Cause of Action is under the Administrative Code of the City of New York §8-107.

The Plaintiff states that the Tenth, Eleventh and Twelfth Causes of Action are under the Age Discrimination in Employment Act, New York State and New York City Administrative Code based upon retaliation for complaining of age discrimination in the workplace.

8.      Legal Basis for Defenses. Defendant UPS reserves the right to add, alter and/or amend its defenses and affirmative defenses as the course of discovery so requires.

      a.  Defendant states the Complaint, or portions thereof, fails to state a claim upon which relief can be granted.

      b.  Defendant states the Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations. More specifically and without limiting the foregoing, Plaintiff alleges in Paragraph 19 of his Complaint that he was unlawfully refused a transfer in February 2003; that claim is barred by the applicable statute of limitations.

c.  Defendant states the Plaintiff's claims are barred, in whole or in part, by the doctrine of laches, waiver, release, satisfaction and accord, estoppel, res judicata, collateral estoppel, and/or unclean hands.

d.  Defendant states that all employment decisions regarding or affecting Plaintiff were based upon legitimate, non-discriminatory reasons that were in no way related to his age or any disability, and were made in good faith and without any intent to discriminate on the basis of age or disability.

e.  Defendant states that at all times during his employment with UPS, Plaintiff was employed at-will.

f.  Defendant states that on the facts alleged, Plaintiff is not entitled to the common law, statutory, or other compensatory, exemplary, or punitive damages, equitable or injunctive relief, interest, pre-judgment interest, costs, disbursements, or pecuniary or non-pecuniary damages requested in the Complaint.

g.  Defendant states that UPS is not liable to Plaintiff for the acts or omissions of any supervisory or managerial employee which were beyond the scope of employment.

h.  Defendant states that the alleged acts or omissions of UPS were not the proximate cause of any injuries or damages allegedly incurred by Plaintiff.

i.  Defendant states that to the extent, if any, Plaintiff has suffered any damages and/or losses, such damages and losses were a result of Plaintiff's own conduct and/or omissions.

j.  Defendant states that Plaintiff has failed to mitigate damages, in whole or in part.

k.  Defendant states that the claims in the Complaint are barred, in whole or in part, by the doctrine of after-acquired evidence.

l.  Defendant states that the ADA is a remedial statutory scheme in which Congress has specified the remedial relief, if any, available to a prevailing plaintiff.  To the extent that Plaintiff seeks remedies beyond the scope of this specified statutory remedy, such claims for relief are improper and should be dismissed.

m. Defendant states that Plaintiff is not entitled to any recovery because any alleged acts or omissions by UPS were made in good faith, in conformity with and reliance on applicable administrative regulations, orders, rulings, approvals or interpretations, or administrative practice or enforcement policies.

n.  Defendant states that at all relevant times, Defendant acted in good faith and with reasonable belief that it has not violated the ADA, ADEA, New York State Human Rights Law, New York City Human Rights Law, or any other law with respect to Plaintiff.

o.  Defendant states that Plaintiff has failed to satisfy conditions precedent to maintaining this action.

p.  Defendant states that Plaintiff has failed to exhaust his administrative remedies and/or to comply with all applicable administrative procedures.

9.    <u>Measure of Proof and Burden of Proof for Each Cause of Action or Defense</u>.  The Plaintiff has the burden of proving, by the preponderance of the evidence, a prima facie case of discrimination.  If the Plaintiff succeeds in proving a prima facie case, the burden shifts to the Defendant to articulate some legitimate non-discriminatory reason for the employment decision. If the Defendant meets this burden, the Plaintiff then must prove by a preponderance of the evidence that the legitimate reasons offered by the employer pretext for discrimination. Defendant UPS anticipates using the defenses listed above to rebut any proof offered by Plaintiff to establish a prima facie case.  Defendant UPS reserves the right to add, alter and/or amend its defenses and affirmative defenses as the course of discovery so requires.

10.    <u>Pleadings and Parties</u>.   The deadline to file amended pleadings and/or add additional parties will be governed by the Federal Rules of Civil Procedure.

11.    <u>Consent to Transfer to Magistrate Judge</u>.  The parties do not consent to transfer the case to a magistrate judge for all purposes.

12.    <u>Initial Disclosures</u>.  Disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure will be made by April 4, 2008.

13.    <u>Discovery Deadlines</u>.

    a.  First requests for production of documents and first requests for interrogatories will be made by May 5, 2008.

    b.  All discovery, including production of all expert reports, if any, will be completed by January 30, 2009.

    c.  Any action to initiate dispositive motions before the Court shall be commenced no later than March 13, 2009.

14.    <u>Expert Discovery</u>.  Plaintiff anticipates calling treating physicians as expert witnesses and reserves the right to retain an accountant as an expert witness.  With Plaintiff having put his medical/physical condition in controversy, Defendant anticipates having at least one expert witness.

    a.  Plaintiff will serve expert reports, if any, upon Defendants no later than November 21, 2008, with Defendants to serve expert reports, if any, upon Plaintiff no later than December 19, 2008.

15.    <u>Other Discovery Matters</u>.

    a.  <u>Depositions</u>.    None of the parties propose any changes to the limitations imposed on depositions by the Federal Rules of Civil Procedure or the Local Rules.

    b.  <u>Interrogatories</u>.    Each party may interpose a maximum of 35 interrogatories.

    c.  <u>Medical Examinations</u>.    Pursuant to Rule 35 of the Federal Rules of Civil Procedure, Defendant may seek physical examinations of Plaintiff who has put in controversy his

physical condition (*see*, *e.g.*, Paragraphs 10, 19, 49, 50, 51, 53 79, 80, 81, 94, 103 and 112 of the Complaint .

        d.      <u>Health Records</u>.  With respect to every health care provider from whom Plaintiff received medical, psychological, or therapeutic care, treatment, consultation, examination or diagnosis at any time beginning January 1, 2000, to the present, Plaintiff will provide to Defendant by May 30, 2008, a signed written authorization (in a form provided to Plaintiff by Defendant) directing each such health care provider to disclose and release to counsel for Defendant all records relating to such care, treatment, consultation, examination, or diagnosis.

        e.      <u>Electronic Discovery</u>.  Documents kept in paper form in the ordinary course shall be produced electronically, in PDF format, with the Bates number included in the image.  All electronically stored information shall also be produced in PDF format, converted directly from the electronic file.

        f.      <u>Privilege</u>.  Any issues regarding the inadvertent production of privileged materials will be governed by the applicable procedural rules.

16.     <u>Status of settlement</u>.  A demand has been made and it was rejected.  The parties do not believe that further settlement efforts will be successful prior to discovery.

17.     <u>Jury Trial</u>.  Plaintiff requests the case be tried with a jury and will know how many days will be required for presentation of the party's case after discovery has been completed.  Defendant UPS requests the case be tried with a jury and will know how many days will be required for presentation of the party's case after discovery has been completed.

Dated:  New York, New York
        March 27, 2007

Respectfully submitted,


By: __/s/ Jonathan L. Sulds_____
    Jonathan L. Sulds (JS-4674)
    Jonathan L. Israel (JI-5882)
    Lauren H. Leyden (LL-0937)
    AKIN GUMP STRAUSS HAUER & FELD LLP
    590 Madison Avenue
    New York, New York 10022
    (212) 872-1000 (tel)
    (212) 872-1002 (fax)
    E-mail: jsulds@akingump.com
         jisrael@akingump.com
         lleyden@akingump.com

*Attorneys for Defendant United Parcel Service, Inc.*

By: _/s/ David G. Gabor_____
    David G. Gabor (DG-9979)
    Gabor & Gabor
    400 Garden City Plaza, Suite 406
    Garden City, New York 11530
    (516) 248-2525 (tel)
    (516) 248-4468 (fax)

*Attorneys for Plaintiff William O'Brien*


SO ORDERED:


_____
            U.S.M.J.